# EXHIBIT 1

<u>**IN THE HIGH COURT OF JUSTICE**</u>                                    <u>**Claim No.:**</u>

<u>**KING'S BENCH DIVISION**</u>

**MEDIA & COMMUNICATIONS LIST**

**BETWEEN:**

**EVANGELOS MARINAKIS**

<u>**Claimant**</u>

**v**

**(1) IRINI KARIPIDIS**

**(2) AMANI SWISS (CYPRUS) LIMITED**

**(3) ARI HAROW**

**(4) SHEYAAN CONSULTING LIMITED**

<u>**Defendants**</u>

_____

**PARTICULARS OF CLAIM**
_____

**Parties**

1. The Claimant is a Greek national. He is a successful businessman who is particularly well-known since 2017 for his involvement in and ownership of Nottingham Forest Football Club (**"NFCC"**) (through NF Football Investment Ltd), which is a hugely popular and well-supported football team that is currently playing in the English Premier League, the top tier of English football. The Claimant also has longstanding business relationships in London, having founded Curzon Maritime Limited, a ship-broking company, in 1991 in England and Wales and living in London for many years thereafter. Through his companies he is the majority owner and chairman of NFFC, attending games and other events as a prominent public figurehead for the club. The Claimant also maintains extensive commercial interests in England and London through the Capital Group of shipping businesses, whose brokering, insurance and legal services interests all have a keen focus on London. His personal interests in London include longstanding personal and social connections, being a member of good standing of Mossiman's since March 1995 and maintaining memberships of Oswalds, 5 Hertford Street and The Arts Club presently.

1

2. The Claimant has a number of other international business interests, including in the world of shipping, media and sports. For example, he is the founder and chairperson of Capital Maritime & Trading Corp, an international shipping company incorporated in the Marshall Islands, operating out of Greece, he was also the founder and former chairman of the US listed shipping company, Capital Product Partners LP, of which he remains the largest shareholder and he is also the majority shareholder in Olympiacos FC, a football club that competes in the Super League Greece.

3. The First Defendant is resident in Greece. She is the President and Managing Director of the Second Defendant. She is the chairperson of Aris Thessaloniki FC, a football club that also competes in the Super League Greece. The First Defendant is also the chairperson of the Hellenic Trade Council HETCO, an international non-governmental organisation based in Athens, Greece. The Second Defendant is a limited company incorporated in Cyprus whose sole shareholder is the First Defendant's husband, Mr Dimitris Messinezis. The Second Defendant operates in numerous international industries such as trade, agri-foods, logistics, real estate, tourism, sports (including its ownership of Aris Thessaloniki), and green technologies.

4. The Third Defendant is resident in Israel. He is the founder and chief executive officer of the Fourth Defendant, which is also based in Israel and operates as a consultancy, advising on and delivering political advocacy strategies internationally. The Third Defendant is a political consultant, and a former chief of staff to the current Prime Minister of Israel, Benjamin Netanyahu.

**The Smear Campaign**

5. The Claimant's claims against the Defendants are for both libel and unlawful means conspiracy. They arise out of a smear campaign waged against the Claimant from 8 November 2023 until at least 23 March 2024 ("**the Smear Campaign**"). As particularised below, the Smear Campaign was organised, paid for and pursued for by the First and Second Defendants, and the Third and Fourth Defendants participated in its creation and implementation, including facilitating payments and providing instruction as part of the Smear Campaign.

6. Pending the provision by them of full disclosure and/or further information, the Claimant

sets out herein below the best particulars which he is able to give in relation to the Smear Campaign waged against him by the Defendants. This has involved the publication of false and defamatory allegations about him:

6.1 in individual articles on a website, the homepage of which was at the URL https://nottinghamforestfire.co.uk ("**the Website**");

6.2 in videos published on the YouTube channel "Nottingham Forest Fire", using the YouTube handle @NottinghamForestFire and publishing from the URL https://www.youtube.com/@NottinghamForestFire ("**the YouTube Channel**");

6.3 in posts and reply posts on 'X' by the 'X' account 'nottinghamforestfire', using the 'X' handle @nottinghamff ("**the X Account**"); and

6.4 on mobile billboards ("**the Mobile Billboards**") driven around Nottingham, UK, by promotional digital advertising vans ("**Digivans**") on 23 December 2023 ("**the First Billboard**") and 7 January 2024 ("**the Second Billboard**").

7. The domain name of the Website, nottinghamforestfire.co.uk, was registered on 8 November 2023 via GoDaddy.com LLC with Nominet, the exclusive domain registrar for UK domain names. The following day, 9 November 2023, the three individual Website articles complained of in this action and particularised in paragraphs 16 to 18 below ("**the Website Articles**") were published on the Website in Anglicised rather than Americanised English, to appear written by and for an English audience.

8. The X Account was also created on 8 November 2023. More than 200 posts and reply posts were published by the X Account, making false and defamatory allegations against the Claimant. The six X posts complained of in this action and particularised in paragraphs 33 to 61 below ("**the X Posts**") actively encouraged the reader to visit the Website, and provided the Website's domain name or a preview image for those purposes.

9. The YouTube Channel was created on 27 November 2023. On that day, four of the six YouTube videos complained of in this action and particularised in paragraphs 19 to 32 below ("**the YouTube Videos**") were published on the Channel. The fifth and sixth videos were published on 20 December 2023. The first, second, fifth and sixth videos actively encouraged the viewer to visit the Website, and included the Website's domain name for those purposes.

10. The First Billboard was driven around Nottingham, UK by a low-load Digivan with the vehicle registration number ("**VRN**") BW17 FFM on 23 December 2023, ahead of a football fixture between NFFC and AFC Bournemouth that same day. This Digivan and the First Billboard were operated by Promogroup Ltd, a UK-based advertising agency. In addition to the matters particularised below, the First Billboard contained a quick response ("**QR**") code, which when scanned brought the user to the Website.

11. The Second Billboard was driven around Nottingham, UK by a Digivan with the VRN CE71 APF on 7 January 2024, ahead of a football fixture between NFFC and Blackpool FC that same day. This Digivan and the Second Billboard were operated by Communicorp UK Ltd, a UK-based marketing agency. In addition to the matters particularised below, the Second Billboard contained a quick response ("**QR**") code, which when scanned brought the user to the Website.

12. From 9 November 2023 and at all material times thereafter, the Website contained the following contents ("**the Website Contents**"):

12.1    a carousel, which presented and enabled the user to access the three Website articles complained of in this action;

12.2    the three Website articles complained of in this action;

12.3    a tab titled "*TIMELINE*", which when clicked presented the user with a timeline, scrollable horizontally, with entries for the years 2011, 2014, 2015, 2021 and 2023 and respectively titled "*ORGANIZED CRIME*", "*Drug Trafficker*", "*Match Fixer*", "*Sanctions Evader*", "*Murderer?*" and "*Money Laundering*";

12.4    a panel which appeared at the bottom of the home page of the Website, which described the Claimant as "*responsible for corruption*" and encouraged readers to "*Stand for Justice & a Corruption-Free Future in Football!*" by signing up for updates and providing their first name, last name, email address and telephone number; and

12.5    a horizontal scrollbar part the way down the home page of the Website ("**the Scrollbar**"). The Scrollbar contained three boxes. Each box contained a photograph of the Claimant and a modified version of the logo of NFFC ("**the Modified Logo**"). The Modified Logo depicted the original NFFC logo's tree as being on fire, and included the additional word "*FIRE*" under the word "*FOREST*".

4

The first box contained the words "*CHARGE MARINAKIS WITH HIS CRIMES[.] CORRUPTION, MATCH-FIXING, DRUG TRAFFICKING*". The second box contained the words "*NOTTINGHAM FOREST F.C. NEEDS NEW OWNERSHIP! REMOVE CORRUPT EVANGELOS MARINAKIS*". The third box contained the words "*WE NEED NEW <u>OWNERSHIP!</u>*". The Claimant will refer to the fact that when users of the Website hover their cursor over the boxes a prompt to download the image appears, indicating it is intended to be used and shared by visitors to the Website on their own social media as part of the campaign.

13. The Smear Campaign was deliberately designed to and did give the false impression that it was a NFFC fan-led, 'grassroots' campaign relating to the ownership of NFFC ("**the Fake NFFC Campaign**"), rather than, as was the case, a smear campaign against the Claimant involving the Defendants. In this regard the Claimant will refer to the following facts and matters:

13.1   the role of each of the individual Defendants in the Smear Campaign was concealed from anyone who visited the Website and/or viewed any of the publications complained of in this action;

13.2   The Website's use of the Modified Logo, and the Update Panel's language and use of the first-person plural, gave the impression to anyone who visited the Website, either directly or pursuant to one of the YouTube videos, X Posts or mobile boards complained of in this action, that the Website and its related campaign were a NFFC fan-based initiative, as did the use of Anglicised English as the language of the Website;

13.3   Four of the six YouTube videos complained of in this action began with the words "*Attention fans*" and contained the phrase "*our owner*". One of the videos contained the phrase "*Is the type of owner we want for our club?*". Another video contained the phrase "*we need to ask ourselves*". The use of this language was clearly designed to and did give the impression that the videos' contents and the related campaign were being produced by and for fans of NFFC;

13.4   One of the X posts complained of in this action encouraged readers to visit the Website as a "*[h]alftime mission for #NFFC fans*", indicating that the post and the wider campaign were produced by and for fans of NFFC.

14. The Smear Campaign was devised and implemented with the assistance of Harris Media LLC ("**Harris Media**"), a digital communications and marketing agency based in Texas, USA. In particular, pending full disclosure and/or the provision of further information, the Claimant's case is that Harris Media:

    14.1    registered the domain name nottinghamforestfire.co.uk on 8 November 2023, and operated the Website at all material times;

    14.2    registered the YouTube channel at the channel url @NottighamForestFire through the email address and Google account nottinghamforestfirefangroup@gmail.com, taking instructions from the First Defendant on the use of the YouTube channel as demonstrated in an email of 9 January 2024.

    14.3    was, through its Director of Accounts Mr Brian Ruddle, the holder of the X Account, and thereby responsible for all of the X Account's output at all material times; and

    14.4    was responsible for commissioning Promogroup Ltd to produce and operate the First Billboard. The billboard was commissioned by Yellow Rook LLC, a company based in Florida, USA, which operates in the marketing and advertising industry. Yellow Rook LLC's registered agent is, and was at all material times, Mr Vincent Harris, the founder and chief executive officer of Harris Media.

    14.5    was responsible for commissioning Communicorp UK Ltd either directly or via the Yellow Rook LLC entity, as noted in instructions from the First Defendant to Harris Media of 9 January 2024 updating on the Smear Campaign and referencing activity in Nottingham on 7 January.

15. Given the scale and wide-ranging nature of the Smear Campaign, and the gravity of the false and defamatory allegations levelled against him, the Claimant was forced to instruct legal representatives to take steps (if possible) to limit the impact of the campaign and to secure the removal of the false and defamatory allegations made online as part of it. On this basis:

    15.1    the first four YouTube videos complained of in this action were geo-blocked in this jurisdiction on 12 December 2023;

    15.2    the X Account was deactivated and permanently taken offline on 29 December

2023;

15.3    the Website was taken down on 19 January 2024; and

15.4    the YouTube channel and the remaining two YouTube videos were removed on approximately 23 March 2024.

**The Claim for Libel**

<u>The Website Articles</u>

*The First Article*

16. On 9 November 2023, the Defendants published or caused to be published an article on the Website at the URL https://nottinghamforestfire.co.uk/marinakis-found-guiltyfor-tax-evasion/ titled "*Evangelos Profits From Transporting Russian Oil*" ("**the First Article**"). The First Article contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

"*Evangelos Profits From Transporting Russian Oil*"

*[photograph of the Claimant]*

"*As the global community reacted with dismay to Russia's invasion of Ukraine in early 2022, Evangelos Marinakis recognized an opportunity for financial gain. While he publicly denounced the invasion and even organised a charity football match between Olympacos and Shakhtar Donetsk from Ukraine to support refugees, his actions behind the scenes told a different story.*

*Despite his public stance, Marinakis' business, Capital Ship Management, continued to engage in lucrative activities, notably the transportation of Russian oil, which indirectly supported the war effort.*

*This contradiction was highlighted when, just days before the charity match, the Alkinoos tanker, flying the Liberian flag but owned by Marinakis, transported Russian oil to Rotterdam in the Netherlands.*"

*The Second Article*

17. On 9 November 2023, the Defendants published or caused to be published an article on the Website at the URL https://nottinghamforestfire.co.uk/nottm-owner-drug-trafficker/ titled "*Nott'm Owner Drug Trafficker?*" ("**the Second Article**"). The Second Article contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

"*Nott'm Owner Drug Trafficker?*"

7

*[photograph of the Claimant]*

*"Evangelos Marinakis, a prominent figure in global shipping and the owner of prominent football clubs, finds himself at the centre of a startling controversy – is he also involved in drug trafficking? The year 2014 marked a significant turning point when the Noor One, a shipping vessel linked to Marinakis, was intercepted off the coast of Greece. Its cargo was astonishing: over 2.1 tonnes of heroin. This massive drug bust not only shocked the public due to its magnitude but also because of its connection to Marinakis, a renowned Greek oligarch.*

*As the investigation into this colossal drug bust unfolded, it unearthed startling evidence of Marinakis' potential involvement with an international drug trafficking syndicate. Reports suggested that Marinakis was not merely a passive investor but was actively engaged in the operation. He was allegedly in consistent communication with key figures in the heroin smuggling network right from the beginning. This includes a particularly notorious meeting held in Dubai, where Marinakis and others reportedly discussed critical aspects of the drug trafficking operation. These discussions are believed to have covered a range of topics, including determining the transport route, strategizing the concealment of the drugs within the vessel, and laying out the plans for distributing the heroin upon its arrival in Europe.*

*Further intensifying the suspicions around Marinakis were bombshell revelations from financial reports. These reports indicated that substantial sums of money had been moved from businesses linked to Marinakis directly to individuals deeply involved in the heroin trafficking operation. This financial trail added another layer of complexity to the investigation, pointing towards a more significant role of Marinakis in this illicit enterprise beyond mere association or indirect involvement."*

*The Third Article*

18. On 9 November 2023, the Defendants published or caused to be published an article on the Website at the URL https://nottinghamforestfire.co.uk/nottm-forest-owner-evangelos-marinakis-caught-match-fixing/ titled "*Match Fixing [:] Nott'm Forest Owner Evangelos Marinakis Caught Match-Fixing!*" ("**the Third Article**"). The Third Article contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

*"Match Fixing"*

*"Nott'm Forest Owner Evangelos Marinakis Caught Match-Fixing!"*

*[photograph of the Claimant]*

*"Evangelos Marinakis, the owner of Nottingham Forest FC, has a lengthy and troubling history of behaviour that transcends mere unsportsmanlike conduct, like his affinity for visiting referee locker rooms, and delves into criminal activities. His involvement in the notorious Greek football match-fixing scandal revealed the extent of his corrupt practices.*

8

*As the leader of a criminal organisation known as "The System," Marinakis, in collaboration with his co-conspirators, embarked on a sinister journey to gain control over Greek football by employing a web of bribery and intimidation tactics. According to Greek prosecutors, Marinakis and his associates harnessed their criminal network to manipulate the outcomes of football matches, ensuring results that favoured their interests through a series of illicit actions.*

*In 2015, Marinakis faced a comprehensive ban from all football-related activities after being charged with a litany of criminal offences including the establishment of a criminal organisation, fraud, attempted extortion, bribery, and, most shockingly, instigating an explosion that posed a threat to human life.*

*The unfolding saga took even more dramatic turns, with widely publicised reports of phone tapping by Greece's intelligence agency. It was alleged that following Marinakis' failed attempt to exert pressure on a referee to favour his Greek team, a bomb attack was carried out on the bakery owned by the same referee, adding a disturbing layer of intrigue to this already sordid tale."*

<u>The YouTube Videos</u>

*The First YouTube Video*

19. On 27 November 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis Match Fixer*" ("**the First YouTube Video**"). The First YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> *"ATTENTION FANS: Did you know our owner was BANNED FOR MATCH-FIXING? That's right, Evangelos Marinakis was involved in criminal match-fixing in Greece where he faced charges for extortion, fraud and even arson. Is this the type of owner we want for our club? Learn more at NottinghamForestFire.co.uk."*

20. The ordinary reasonable reader would have visited the Website using the domain name provided and read each of the Website Articles:

  20.1  The clear purpose and effect of the First YouTube Video was to:

    20.1.1    incite the viewer's interest in the Claimant and the Fake NFFC Campaign's content by addressing itself directly to NFFC fans and making salacious allegations against the Claimant, NFFC's owner, in provocative and scandalous terms;

    20.1.2    encourage the viewer to actively consider whether the Claimant was in fact a suitable figure to own NFFC; and

    20.1.3    actively direct the viewer to visit the Website to learn about the

9

Claimant's alleged criminal past and unsuitability to be the owner of NFFC, including by stating that "more" information concerning these matters was available there.

20.2    The ordinary reasonable reader of the First YouTube Video, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the basis of that interest and in light of the inducement referred to above.

20.3    Once on the Website, the ordinary reasonable reader would have read the Website Articles:

20.3.1  The Website Contents all formed part of a single campaign against the Claimant which:

20.3.1.1    was presented by the Website;

20.3.1.2    was the ostensible reason for the Website's existence; and

20.3.1.3    the Website was seemingly dedicated to.

20.4    On this basis, the ordinary reasonable reader would have approached the Website as a single, comprehensive resource of materials relating to both the campaign and the Claimant, and would have read all of the Website Contents together, including each of the Website Articles;

20.5    All of the Website Contents, including each of the Website Articles, were on the same topic, being the Claimant and his alleged unfitness to be owner of NFFC. The ordinary reasonable reader of the Website, having an interest in the affairs of NFFC and its ownership, or the governance of English football more widely, would therefore have read all of the website's contents, including each of the Website Articles;

20.6    The Website encouraged visitors to read of all its content; and

20.7    Each of the Website Articles was short and concise, meaning that the ordinary reasonable reader could and would have read them in a single visit.

21. The words complained of by the Claimant in the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the First YouTube Video, and are to be treated as part of the First YouTube Video when assessing its natural and ordinary meaning.

*The Second YouTube Video*

10

22. On 27 November 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis Drug Smuggler*" ("**the Second YouTube Video**"). The Second YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> "*ATTENTION FANS: Did you know our owner is an ILLEGAL DRUG TRAFFICKER?! That's right, criminal charges were brought against Evangelos Marinakis for financing and storing drug substances on one of his ships. So, we need to ask ourselves: was Nottingham Forest purchased with drug money? Learn more at NottinghamForestFire.co.uk.*"

23. The ordinary reasonable reader would have visited the Website using the domain name provided and read each of the Website Articles:

    23.1    The clear purpose and effect of the Second YouTube Video was to:

        23.1.1  incite the viewer's interest in the Claimant and the Fake NFFC Campaign's content by addressing itself directly to NFFC fans and making salacious allegations against the Claimant, NFFC's owner, in provocative and scandalous terms;

        23.1.2  encourage the viewer to actively consider whether the Claimant bought NFFC with money obtained by him through the illegal trafficking of drugs; and

        23.1.3  actively direct the viewer to visit the Website to learn about the Claimant's alleged criminal past and the alleged provenance of the funds with which he acquired NFFC, including by stating that "more" information concerning these matters was available there.

    23.2    The ordinary reasonable reader of the Second YouTube Video, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the basis of that interest and in light of the inducement referred to above.

    23.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

24. The words complained of by the Claimant in the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the Second YouTube Video, and are to be treated as part of the Second YouTube Video when assessing its natural and ordinary meaning.

11

*The Third YouTube Video*

25. On 27 November 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis Match Fixing Bumper*" ("**the Third YouTube Video**"). The Third YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> "ATTENTION FANS: Did you know our owner was BANNED FOR MATCH FIXING?!"

*The Fourth YouTube Video*

26. On 27 November 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis Drugs Bumper*" ("**the Fourth YouTube Video**"). The Fourth YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> "ATTENTION FANS: Did you know our owner is an ILLEGAL DRUG TRAFFICKER?!"

*The Fifth YouTube Video*

27. On 20 December 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis naughty or nice*" ("**the Fifth YouTube Video**"). The Fifth YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> "*Evangelos Marinakis wants you to think he is on the nice list. Unfortunately for him, Father Christmas has seen all the naughty things he has done. Evangelos has been arrested for participating in a drug smuggling ring, running a match fixing organisation and profited from transporting Russian oil. Learn why by going to nottinghamforestfire.co.uk.*"

28. The ordinary reasonable reader would have visited the Website using the domain name provided and read each of the Website Articles:

    28.1    The clear purpose and effect of the Fifth YouTube Video was to:

        28.1.1  incite the viewer's interest in the Claimant and the Fake NFFC Campaign's content by making salacious allegations against the Claimant, NFFC's owner, in provocative and scandalous terms;

        28.1.2  indicate that the Claimant had himself sought to conceal those matters, such as to generate a sense of mystery and cover-up and thereby draw

the reader further into the campaign's narrative; and

28.1.3  actively direct the viewer to visit the Website to learn about the Claimant's alleged criminal past, including by stating that the viewer could learn "why" the Claimant had been arrested there.

28.2    The ordinary reasonable reader of the Fifth YouTube Video, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the basis of that interest and in light of the inducement referred to above.

28.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

29. The words complained of by the Claimant in the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the Fifth YouTube Video, and are to be treated as part of the Fifth YouTube Video when assessing its natural and ordinary meaning.

*The Sixth YouTube Video*

30. On 20 December 2023, the Defendants published or caused to be published a video on the YouTube Channel titled "*Marinakis naughty or nice*" ("**the Sixth YouTube Video**"). The Sixth YouTube Video contained the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

"*Evangelos Marinakis is on the naughty list. See why at nottinghamforestfire.co.uk.*"

31. The ordinary reasonable reader would have visited the Website using the domain name provided and read each of the Website Articles:

31.1    The clear purpose and effect of the Sixth YouTube Video was to:

31.1.1  incite the viewer's interest in the Claimant and the Fake NFFC Campaign's content through the salacious statement that the Claimant, NFFC's owner, was "on the naughty list", which was self-evidently suggestive of impropriety and/or unethical behaviour; and

31.1.2  actively direct the viewer to visit the Website to learn about the alleged facts and matters that lay behind that statement, by stating that the reader could learn "why" the Claimant was on the "naughty list" there.

31.2    The ordinary reasonable reader of the Sixth YouTube Video, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the

basis of that interest and in light of the inducement referred to above.

31.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

32. The words complained of by the Claimant in the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the Sixth YouTube Video, and are to be treated as part of the Sixth YouTube Video when assessing its natural and ordinary meaning.

<u>The X Posts</u>

*The First X Post*

33. On 8 December 2023, the Defendants published or caused to be published a post by the X Account on the 'X' platform ("**the First X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> *"Did you know that Nottingham Forest owner Evangelos Marinakis was arrested for Drug Trafficking? Learn the shocking truth here! nottinghamforestfire.co.uk"*

34. The text "*nottinghamforestfire.co.uk*" contained a hyperlink to the Website. In addition, the Second YouTube Video was embedded in the First X Post.

35. The ordinary reasonable reader would have followed the hyperlink to the Website and read each of the Website Articles:

35.1    The clear purpose and effect of the First X Post was to:

35.1.1  incite the reader's interest in the Claimant and the campaign's content by making salacious allegations against the Claimant, NFFC's owner, in revelatory terms; and

35.1.2  actively direct the reader to follow the hyperlink to the Website to learn about the Claimant's alleged criminal past, including through the revelatory phrase "*Learn the shocking truth here!*".

35.2    The ordinary reasonable reader of the First X Post, having an interest in the affairs of NFFC and its ownership, would have followed the hyperlink to the Website on the basis of that interest and in light of the inducements referred to above.

35.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

14

36. The ordinary reasonable reader would also have watched the Second YouTube Video:

    36.1    It was presented as part of the First X Post, and was part of its immediate context;

    36.2    Paragraph 35.1 above is repeated. The ordinary reasonable reader, having had their interest and curiosity in the Claimant and the Fake NFFC Campaign's content raised, including as a result of the highly suggestive phrase "*Learn the shocking truth here!*", would naturally have been induced to proceed to watch the Second YouTube Video to discover further information about these matters.

    36.3    The ordinary reasonable reader of the First X Post, having an interest in the affairs of NFFC and its ownership, would have watched the Second YouTube Video on the basis of that interest and in light of the inducement referred to above.

37. The words complained of by the Claimant (a) in each of the Website Articles, as set out at Schedule 1 to these Particulars of Claim, and (b) in the Second YouTube Video, as set out at paragraph 22 above, are therefore part of the First X Post, and are to be treated as part of the First X Post when assessing its natural and ordinary meaning.

*The Second X Post*

38. On 15 December 2023, the Defendants published or caused to be published a post by the X Account on the 'X' platform ("**the Second X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

    *"Hey #THFC fans, it would be a shame if people saw this information about Nottingham owner Evangelos Marinakis. nottinghamforestfire.co.uk.*

39. The Second X Post contained a poster ("**the Poster**"). The Poster contained:

    39.1    further text defamatory of the Claimant and seriously harmful to his reputation, being "*DID YOU KNOW? EVANGELOS MARINAKIS WAS ARRESTED FOR DRUG TRAFFICKING*";

    39.2    three images of the Claimant; and

    39.3    images of handcuffs in its top-left and bottom-right corners.

40. The text "*nottinghamforestfire.co.uk*" in the Second X Post contained a hyperlink to the

Website.

41. The ordinary reasonable reader would have followed the hyperlink to the Website and read each of the Website Articles:

    41.1    The clear purpose and effect of the Second X Post was to:

        41.1.1 incite the reader's interest in the Claimant and the Fake NFFC Campaign's content by making salacious allegations against the Claimant, NFFC's owner, in provocative and scandalous terms; and

        41.1.2 actively direct the reader to follow the hyperlink to the Website to learn about the Claimant's alleged criminal past, including through the highly suggestive phrases "*DID YOU KNOW?*" and "*it would be a shame if people saw this information*...", and the dramatic imagery employed in the Poster.

    41.2    The ordinary reasonable reader of the Second X Post, having an interest in the affairs of NFFC and its ownership, would have followed the hyperlink to the Website on the basis of that interest and in light of the inducements referred to above.

    41.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

42. The words complained of by the Claimant in each of the Website Articles, as set out at paragraph 16 to 18 above, are therefore part of the Second X Post, and are to be treated as part of the Second X Post when assessing its natural and ordinary meaning.

*The Third X Post*

43. On 15 December 2023, the Defendants published or caused to be published a reply post by the X Account on the 'X' platform ("**the Third X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

    *"You do know that #NFFC owner Evangelos Marinakis was banned in the [sic] for being part of an [sic] match fixing ring in Greece… Just saying…"*

44. The Third X post contained a preview image, which when clicked brought the user to the Website ("**the Preview Image**"). The Preview Image contained:

    a.   an image of the Claimant;

16

26

b.  the text "nottinghamforestfire.co.uk"; and

c.  the Modified Logo.

45. The ordinary reasonable reader would have followed the Preview Image to the Website and read each of the Website Articles:

45.1    The clear purpose and effect of the Third X Post was to:

45.1.1 incite the reader's interest in the Claimant and the Fake NFFC Campaign's content by making salacious allegations against the Claimant, NFFC's owner, in terms which were designed to create intrigue; and

45.1.2 actively direct the reader to follow the Preview Image to the Website to learn about the Claimant's alleged criminal past, including through the intrigue-laden language in the post.

45.2    The ordinary reasonable reader of the Third X Post, having an interest in the affairs of NFFC and its ownership, would have followed the Preview Image to the Website on the basis of that interest and in light of the inducements referred to above.

45.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

46. The words complained of by the Claimant in each of the Website Articles, as set out at paragraphs 16 to 18  above, are therefore part of the Third X Post, and are to be treated as part of the Third X Post when assessing its natural and ordinary meaning.

*The Fourth X Post*

47. On 15 December 2023, the Defendants published or caused to be published a post by the X Account on the 'X' platform ("**the Fourth X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

*"There's a new site about Nottingham FC owner Evangelos Marinakis that you should check out."*

48. The Fourth X post contained the Preview Image.

49. The ordinary reasonable reader would have followed the Preview Image to the Website and read each of the Website Articles:

49.1    The sole purpose and clear effect of the Fourth X Post was to incite the reader's interest in the Website by describing it as "*new*" and informing them that it was a site which they "*should check out*".

49.2    Accessing the site involved simply clicking on the Preview Image, which, in light of the matters referred to above, the ordinary reasonable reader would plainly have done.

49.3    The ordinary reasonable reader of the Fourth X Post, having an interest in the affairs of NFFC and its ownership, would have followed the Preview Image to the Website on the basis of that interest and in light of the ease with which it could be accessed.

49.4    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

50. The words complained of by the Claimant in each of the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the Fourth X Post, and are to be treated as part of the Fourth X Post when assessing its natural and ordinary meaning.

*The Fifth X Post*

51. On 15 December 2023, the Defendants published or caused to be published a post by the X Account on the 'X' platform ("**the Fifth X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> *"Halftime mission for #NFFC fans… Go to nottinghamforestfire.co.uk and learn more about owner Evangelos Marinakis."*

52. The text "*nottinghamforestfire.co.uk*" in the Fifth X Post contained a hyperlink to the Website.

53. The Fifth X Post also contained the Preview Image.

54. The ordinary reasonable reader would have followed the hyperlink and/or the Preview Image to the Website and read each of the Website Articles:

54.1    The sole purpose and clear effect of the Fifth X Post was to incite the reader's interest in the Website by setting fans of NFFC a "*halftime mission*" to visit it;

54.2    The Fifth X post informed the reader that they could "*learn more*" about the Claimant at the Website.

18

54.3    Accessing the site involved simply clicking on the hyperlink or the Preview Image, which, in light of the matters referred to above, the ordinary reasonable reader would plainly have done.

54.4    The ordinary reasonable reader of the Fifth X Post, having an interest in the affairs of NFFC and its ownership, would have followed the hyperlink and/or the Preview Image to the Website on the basis of that interest and in light of the ease with which it could be accessed.

54.5    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

55. The words complained of by the Claimant in each of the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the Fifth X Post, and are to be treated as part of the Fifth X Post when assessing its natural and ordinary meaning.

*The Sixth X Post*

56. On 15 December 2023, the Defendants published or caused to be published a reply post by the X Account on the 'X' platform ("**the Sixth X Post**") containing the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

> *"The fact that Evangelos was involved with the #slgr after his sorted [sic] past is crazy. Check out nottinghamforestfire.co.uk and learn more."*

57. The text "*nottinghamforestfire.co.uk*" in the Sixth X Post contained a hyperlink to the Website.

58. The First YouTube video was also embedded in the Sixth X Post.

59. The ordinary reasonable reader would have followed the hyperlink to the Website and read each of the Website Articles:

59.1    The clear purpose and effect of the Sixth X Post was to:

59.1.1    incite the reader's interest in the Claimant and the Fake NFFC Campaign's content by alleging that the Claimant, NFFC's owner, had a "sordid" past; and

59.1.2    actively direct the reader to follow the hyperlink to the Website to find out more information about the Claimant's alleged sordid past, by encouraging them to "*check out*" the Website and "*learn more*".

19

59.2   The ordinary reasonable reader of the Sixth X Post, having an interest in the affairs of NFFC and its ownership, would have followed the hyperlink to the Website on the basis of that interest and in light of the inducements referred to above.

59.3   Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

60. The ordinary reasonable reader would also have watched the First YouTube Video:

60.1    It was presented as part of the Sixth X Post, and was part of its immediate context;

60.2    The ordinary reasonable reader, having had their interest and curiosity in the Claimant and the Fake NFFC Campaign's content raised, as a result of the revelatory phrase "*Learn the shocking truth here!*", would naturally have gone on to watch the First YouTube Video to discover further information about these matters.

60.3    The ordinary reasonable reader of the First X Post, having an interest in the affairs of NFFC and its ownership, would have watched the First YouTube Video on the basis of that interest and in light of the inducements referred to above.

60.4    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

61. The words complained of by the Claimant in (a) each of the Website Articles, as set out at paragraphs 16 to 18 above above, and (b) the First YouTube Video, as set out at paragraph 19 above, are therefore part of the Sixth X Post, and are to be treated as part of the Sixth X Post when assessing its natural and ordinary meaning.

<u>The Mobile Billboards</u>

*The First Billboard*

62. On 23 December 2023, the Defendants published or caused to be published on the First Billboard (as defined above at paragraph 6 above) the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

"*WHY IS EVANGELOS MARINAKIS ON THE <u>NAUGHTY LIST?</u> FIND OUT AT: NOTTINGHAMFORESTFIRE.CO.UK*"

63. The First Billboard contained:

20

30

a.  an image of the Claimant, modified to show him wearing a Santa Claus hat;

b.  the text "*PAID FOR BY NOTTINGHAM FOREST FIRE*"; and

c.  a QR code, which when scanned brought the user to the Website.

64. The ordinary reasonable reader would have visited the Website, by scanning the QR code and/or manually entering the domain name into a web browser on a device with Internet access, and thereafter read each of the Website Articles:

64.1    The sole purpose and clear effect of the First Billboard was to:

64.1.1  incite the reader's interest in the Claimant and the Fake NFFC Campaign's content by arousing the reader's curiosity as to why the Claimant was allegedly on "*the naughty list*"; and

64.1.2  actively direct the reader to scan the QR code and/or otherwise visit the Website to find out the ostensible answer to that question.

64.2    The First Billboard was driven around Nottingham, home of NFFC, on the day of a NFFC match. The First Billboard was positioned in locations around Nottingham, including in Upper Parliament Street in the centre of the city, to attract the attention of fans heading towards NFFC's ground ahead of the game. It was noticed by a business contact of the Claimant on Upper Parliament Street, who sent him photographs of it via WhatsApp at 11.44am. The First Billboard was noticed by fans and images shared on social media, including Posts on Twitter/X at 12.29pm and 1.55pm at Radcliffe Road, Nottingham, a main feeder road to NFFC's City Ground stadium. The Claimant will refer to the fact that the provider of the Digivan states on its website that vans are booked for a minimum unit of one day, comprising eight hours of use.

64.3    The fact of the First Billboard being driven around Nottingham in the circumstances referred to above, namely a deliberately unusual and eye-catching means of communicating a message about the Claimant, would have led the ordinary reasonable reader to visit the Website.

64.4    The ordinary reasonable reader of the First Billboard, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the basis of that interest and in light of the inducement referred to above.

21

64.5    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

65. The words complained of by the Claimant in each of the Website Articles, as set out at paragraphs 16 to 18 above, are therefore part of the First Billboard, and are to be treated as part of the First Billboard when assessing its natural and ordinary meaning.

*The Second Billboard*

66. On 7 January 2024, the Defendants published or caused to be published on the Second Billboard (as defined above at paragraph 6 above) the following words defamatory of the Claimant and seriously harmful to the Claimant's reputation:

*"A MESSAGE FROM A.I. MARINAKIS. NOTTINGHAMFORESTFIRE.CO.UK"*

67. The Second Billboard contained:

a. a digital caricature of the Claimant, depicting him as an evil and menacing figure;

b. the text "*PAID FOR BY NOTTINGHAM FOREST FIRE*"; and

c. a QR code, which when scanned brought the user to the Website.

68. The ordinary reasonable reader would have visited the Website, by scanning the QR code and/or manually entering the domain name into a web browser on a device with Internet access, and thereafter read each of the Website Articles:

68.1    The sole purpose and clear effect of the Second Billboard was to:

68.1.1 incite the reader's interest in the Claimant and the Fake NFFC Campaign's content by arousing the reader's curiosity as to what the Claimant's "*message*" was, in circumstances where he was depicted him as an evil and menacing figure; and

68.1.2 actively direct the reader to scan the QR code and/or otherwise visit the Website to find out the ostensible answer to that question.

68.2    The Second Billboard was driven around Nottingham, home of NFFC, on the day of a NFFC match. It was photographed being driven in Nottingham, including outside a branch of Poundland in Nottingham city centre, before the match, before being parked on Pavillion Road Nottingham adjacent to the entry of NFFC's stadium, where it was photographed at 11.42am by current and former NFFC staff

22

members. Pavillion Road is the primary access road to NFFC's City Ground stadium, and leads directly to the club shop as well as the entrances used by media attendees, club officials and sporting dignitaries. As a result it would have been seen by a great number of supporters and others attending the match. The Claimant will refer to the fact that the provider of the van states that its vehicles are supplied for a fixed daily fee.

68.3    The fact of the Second Billboard being driven around Nottingham and positioned outside NFFC's stadium on the day of a match in the circumstances referred to above, namely a deliberately unusual and eye-catching means of communicating a message about the Claimant, would have led the ordinary reasonable reader to visit the Website.

68.4    The ordinary reasonable reader of the Second Billboard, having an interest in the affairs of NFFC and its ownership, would have visited the Website on the basis of that interest and in light of the inducement referred to above.

68.5    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read the Website contents.

69. The words complained of by the Claimant in each of the Website Articles, as set out paragraph 16 to 18 above, are therefore part of the Second Billboard, and are to be treated as part of the Second Billboard when assessing its natural and ordinary meaning.

**Defamatory Meaning**

<u>The Website Articles</u>

*The First Article*

70. In their natural and ordinary meaning, the words complained of in the First Article meant and would be understood to mean that despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil.

*The Second Article*

71. In their natural and ordinary meaning, the words complained of in the Second Article

meant and would be understood to mean that there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin.

*The Third Article*

72. In their natural and ordinary meaning, the words complained of in the Third Article meant and would be understood to mean that the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation, match-fixing and arranging a bomb attack on a bakery owned by a referee.

<u>The YouTube Videos</u>

*The First YouTube Video*

73. In their natural and ordinary meaning, the words complained of in the First YouTube Video meant and would be understood to mean that:

    73.1    the Claimant was guilty of criminal football match-fixing practices in Greece, including extortion, fraud and arson;

    73.2    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

    73.3    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

    73.4    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain

control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Second YouTube Video*

74. In their natural and ordinary meaning, the words complained of in the Second YouTube Video meant and would be understood to mean that:

74.1    the Claimant is an illegal drug trafficker, who is guilty of financing and facilitating the storage of illegal drugs on a ship owned by him;

74.2    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

74.3    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

74.4    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Third YouTube Video*

75. In their natural and ordinary meaning, the words complained of in the Third YouTube Video meant and would be understood to mean that the Claimant is guilty of match-fixing.

*The Fourth YouTube Video*

76. In their natural and ordinary meaning, the words complained of in the Fourth YouTube Video meant and would be understood to mean that the Claimant is an illegal drug trafficker.

*The Fifth YouTube Video*

77. In their natural and ordinary meaning, the words complained of in the Fifth YouTube

25

Video meant and would be understood to mean that:

77.1    the Claimant is guilty of participating in a drug-smuggling ring, running a match-fixing organisation and illicitly profiting from transporting Russian oil;

77.2    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

77.3    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

77.4    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Sixth YouTube Video*

78. In their natural and ordinary meaning, the words complained of in the Sixth YouTube Video meant and would be understood to mean that:

78.1    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

78.2    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

78.3    the Claimant is the leader of a criminal organisation known as "The System",

through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

<u>The X Posts</u>

*The First X Post*

79. In their natural and ordinary meaning, the words complained of in the First X Post meant and would be understood to mean that:

   79.1    the Claimant is an illegal drug trafficker, who is guilty of financing and facilitating the storage of illegal drugs on a ship owned by him;

   79.2    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

   79.3    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

   79.4    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Second X Post*

80. In their natural and ordinary meaning, the words complained of in the Second X Post meant and would be understood to mean that:

   80.1    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, his company, Capital Ship Management, of Russian oil;

80.2    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

80.3    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Third X Post*

81. In their natural and ordinary meaning, the words complained of in the Third X Post meant and would be understood to mean that:

81.1    the Claimant was part of a football match-fixing ring in Greece;

81.2    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

81.3    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

81.4    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Fourth X Post*

82. In their natural and ordinary meaning, the words complained of in the Fourth X Post meant and would be understood to mean that:

82.1    despite pretending publicly to be critical of the Russian Federation's invasion

28

of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

82.2    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

82.3    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Fifth X Post*

83. In their natural and ordinary meaning, the words complained of in the Fifth X Post meant and would be understood to mean that:

83.1    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

83.2    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

83.3    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Sixth X Post*

84. In their natural and ordinary meaning, the words complained of in the Sixth X Post meant and would be understood to mean that:

    84.1   the Claimant was guilty of criminal football match-fixing practices in Greece, including extortion, fraud and arson;

    84.2   despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil

    84.3   there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

    84.4   the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

<u>The Mobile Billboards</u>

*The First Billboard*

85. In their natural and ordinary meaning, the words complained of in the First Billboard meant and would be understood to mean that:

    85.1   despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

    85.2   there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin

smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

85.3    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

*The Second Billboard*

86. In their natural and ordinary meaning, the words complained of in the Second Billboard meant and would be understood to mean that:

86.1    despite pretending publicly to be critical of the Russian Federation's invasion of Ukraine in 2022, the Claimant had cynically and hypocritically engaged in lucrative commercial activities for his own personal gain which indirectly supported the Russian war effort in Ukraine – notably the transportation, through his company, Capital Ship Management, of Russian oil;

86.2    there are strong grounds to suspect that the Claimant is deeply and actively involved in international heroin trafficking, including through being in consistent communication with and meeting with key figures in an international heroin smuggling network, and providing substantial amounts of money to individuals themselves deeply involved in trafficking heroin;

86.3    the Claimant is the leader of a criminal organisation known as "The System", through which he and others engaged in criminal and corrupt practices to gain control over national football in Greece, including fraud, attempted extortion, bribery, intimidation.

**Substantial Publication**

87. The Claimant contends that the statements complained of above were substantially published, and thereby received a huge readership or viewing, within the jurisdiction. Pending full admissions and/or disclosure or the provision of further information as to the precise extent of their publication, the Claimant will rely in support of this contention upon the following facts and matters.

The Website Articles

88. In support of his case that each of the Website Articles was substantially published, and

31

thereby received a huge readership or viewing, within the jurisdiction of the Court, the Claimant will rely on the following facts and matters:

88.1    The Website Articles were freely available to the world at large to view. The Website had no paywall, and no registration was required to view any of its contents, including the Website Articles;

88.2    The Website and the Website Contents, including the Website Articles, were online for well over two months, from 9 November 2023 until 19 January 2024;

88.3    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read each of the Website Articles. Shortly before it was geo-blocked in England and Wales, on 11 December 2023, the First YouTube Video had been viewed 20,000 times. As at 14 March 2024, approximately nine days before the YouTube Channel was removed, the First YouTube Video had been viewed more than 21,000 times. It is to be inferred that by 12 December 2023, when the First YouTube Video was geo-blocked in this jurisdiction:

88.3.1. a significant number of people had already viewed the video within England and Wales, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction; and

88.3.2. a significant proportion of that number will have followed the instruction to access the Website and read each of the Website Articles.

88.4    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read each of the Website Articles. Shortly before it was geo-blocked in England and Wales, on 11 December 2023, the Second YouTube Video had been viewed 16,000 times. As at 14 March 2024, approximately nine days before the YouTube Channel was removed, the Second YouTube Video had been viewed more than 17,000 times. It is to be inferred that by 12 December 2023, when the Second YouTube Video was geo-blocked in this jurisdiction:

88.4.1    a significant number of people had already viewed the video within England and Wales, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction; and

88.4.2    a significant proportion of that number will have followed the

instruction to access the Website and read each of the Website Articles.

88.5    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read each of the Website Articles. As at 14 March 2024, approximately nine days before the YouTube Channel was removed, the Fifth YouTube Video had been viewed more than 10,000 times. It is to be inferred that:

88.5.1    a significant number of people had already viewed the video within England and Wales, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction; and

88.5.2    a significant proportion of that number will have followed the instruction to access the Website and read each of the Website Articles.

88.6    Paragraph 20 above is repeated. In the premises, the ordinary reasonable reader would have read each of the Website Articles.  As at 14 March 2024, approximately nine days before the YouTube Channel was removed, the Sixth YouTube Video had been viewed more than 160 times. It is to be inferred that:

88.6.1    a number of people had already viewed the video within England and Wales, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction; and

88.6.2    a significant proportion of that number will have followed the instruction to access the Website and read each of the Website Articles.

88.7    Paragraph 8 above is repeated. The vast majority of the posts and reply posts published by the X Account contained a hyperlink or other means of easily accessing the Website. It is to be inferred that a significant proportion of those who viewed a post published by the X account will have visited the Website by following the hyperlink or via the other means provided in the relevant post;

88.8    The Claimant will also rely on the following posts (in addition to those complained of above) by the X Account, each of which contained a hyperlink to

33

the Website, and will say that is it to be inferred that a significant proportion of the readers of each of them will have followed the hyperlink to the website and, in the circumstances referred to above above, read each of the Website Articles:

88.8.1  A post published on 20 December 2023, which as of that date had been viewed approximately 770 times, and which read:

> *"It's a sad day for many #NFFC fans. What do you know about the man who let Steve Cooper go? Repost to spread the word & learn more about @NFFC owner Evangelos Marinakis at nottinghamforestfire.co.uk"*

88.8.2  A post published on 20 December 2023, which as of that date had been viewed approximately 1,100 times, and which read:

> *"Evangelos Marinakis may not have too many #NFFC fans today, but he does have a list of supporters you need to know about. Nottinghamforestfire.co.uk"*

88.8.3  A post published on 25 December 2023, which as of 28 December 2023 had been viewed approximately 4,700 times, and which contained the words and image particularised at paragraph 62 above.

88.8.4  A post published on 3 January 2024, which as of 9 January 2024 had been viewed approximately 1,100 times, and which read:

> *"Qatargate, Noor One and Match-Fixing, scandals seem to follow #NFFC owner Evangelos Marinakis wherever he goes… Learn more at nottinghamforestfire.co.uk"*

88.8.5  A post published on 7 January 2024, which as of 9 January 2024 had been viewed approximately 12,000 times, and which read:

> *"NFFC must demand new ownership. Find out why at: nottinghamforestfire.co.uk."*

88.8.6  A post published on 9 January 2024, which as of that date had been viewed approximately 1,600 times, and which read:

> *"#NFFC owner, Evangelos Marinakis, doesn't shy away from controversy. From pitch disruptions aggressive confrontations with referees, his tenure has been turbulent. The chaos is destined to continue. #Marinakis #FootballChaos Learn more at nottinghamforestfire.co.uk"*

34

88.9    Paragraphs 62 to 65 above are repeated. It is to inferred that a significant proportion of those who viewed the First Billboard will have scanned the QR code and/or otherwise visited the Website and read each of the Website Articles;

88.10   Paragraphs 66 to 69 above are repeated. It is to inferred that a significant proportion of those who viewed the Second Billboard will have scanned the QR code and/or otherwise visited the Website and read each of the Website Articles;

88.11   Given the Website's focus on NFFC, a well-known Premier League football club in this jurisdiction, it is generally to be inferred that a significant proportion of those who viewed the Website, including the Website Articles, were based in England and Wales.

The YouTube Videos

89. In support of his case that the each of the YouTube Videos was substantially published, and thereby received a huge readership or viewing, within the jurisdiction of the Court, the Claimant will rely on the following facts and matters:

89.1    From its creation on 27 November 2023 until its removal on 23 March 2024, the YouTube Channel was freely available to the world at large to view. No registration was required to view any of the YouTube Videos;

89.2    As at 14 March 2024, the First YouTube Video had been viewed more than 21,000 times. Shortly before it was geo-blocked in England and Wales on 11 December it had been viewed 20,000 times. It is to be inferred that by 12 December 2023, when the First YouTube Video was geo-blocked in this jurisdiction, a significant number of people had, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction, viewed the video in England and Wales;

89.3    Paragraphs 56 to 61 above are repeated. It is to be inferred that a significant proportion of those who read the Sixth X Post will have watched the First YouTube Video;

89.4    As at 14 March 2024, the Second YouTube Video had been viewed more than 17,000 times. Shortly before it was geo-blocked in England and Wales on 11 December it had been viewed 16,000 times.  It is to be inferred that by 12

December 2023, when the Second YouTube Video was geo-blocked in this jurisdiction, a significant number of people had, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction, viewed the video in this jurisdiction.

89.5    As at 14 March 2024, the Fifth YouTube Video had been viewed more than 10,000 times. It is to be inferred that a significant number of people had, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction, viewed the video in this jurisdiction.

89.6    As at 14 March 2024, the Sixth YouTube Video had been viewed more than 160 times. It is to be inferred that a significant number of people had, given the video's focus on NFFC, a well-known Premier League football club in this jurisdiction, viewed the video in this jurisdiction.

89.7    The First, Second, Third and Fourth YouTube Videos were online and available to the world at large to view in this jurisdiction for more than two weeks, from 27 November until 12 December 2023;

89.8    The Fifth and Sixth YouTube Videos were online and available to the world at large to view in this jurisdiction for more than three months, from 20 December 2023 until approximately 23 March 2024.

89.9    Given the YouTube Channel's focus on NFFC, a well-known Premier League football club in this jurisdiction, it is generally to be inferred (as the change in rate of viewing after the videos were geo-blocked in England and Wales strongly supports) that a significant proportion of those who viewed the YouTube Videos were based in England and Wales.

### The X Posts

90. In support of his case that each of the X Posts was substantially published, and thereby received a considerable readership or viewing, within the jurisdiction of the Court, the Claimant will rely on the following facts and matters:

90.1    From its creation on 8 November 2023 until its removal on 29 December 2023, the X Account was accessible to all users of X who were logged into the platform,

not just those who followed the X Account;

90.2    Before it was removed, the X Account had 50 followers and followed 458 accounts;

90.3    As at 18 December 2023, the X Posts had several hundred views:

90.4    Given the X Account's focus on NFFC, a well-known Premier League football club in this jurisdiction, it is to be inferred that a significant proportion of those who viewed the X Posts were based in England and Wales;

The Mobile Billboards

91. In support his case that each of the Mobile Billboards was substantially published within the jurisdiction of the Court, the Claimant will rely upon the following facts and matters:

91.1    In respect of the First Billboard

91.1.1 It was photographed at locations throughout Nottingham on the morning of the match before being stationed by midday outside NFFC's stadium ahead of a 3.00pm kick off, where it was plainly visible to the 30,000 supporters, media representatives and sporting dignitaries attending;

91.1.2 The First Billboard was noticed by fans and images shared on social media, including Posts on Twitter/X at 12.29pm and 1.55pm at Radcliffe Road, Nottingham, a main feeder road to NFFC's City Ground stadium;

91.1.3 Users of NFFC supporter websites commented on the presence of the van, the existence of the campaign and noted the website, including in discussion on the website forestforum.co.uk.

91.2    In respect of the Second Billboard;

91.2.1 It was photographed at locations throughout Nottingham between at least midday and was stationed on Pavillion Road Nottingham outside the entrance to NFFC's City Ground by at least 12.16pm ahead of a 3.00pm kick-off where it was plainly visible to the 30,000 supporters, media representatives and sporting dignitaries attending;

91.2.2 Images of the van operating were recorded and published by social

media users including on Twitter/X and on the Nottingham Forest supporter website forestforum.co.uk;

**Serious Harm**

92   The publication of each of (a) the Website Articles, (b) the YouTube Videos, (c) the X Posts, and (d) the Mobile Billboards has caused and/or is likely to have caused serious harm to the reputation of the Claimant for the purposes of s.1(1), Defamation Act 2013, within the jurisdiction of the Court.

   The Website Articles

93   In support of his case on serious harm in relation to the publication of each of the Website Articles, the Claimant will rely on the following facts and matters:

   93.1   The nature and extent of the Claimant's reputation in England and Wales, as particularised above at paragraph 1 and 2 above;

   93.2   The highly defamatory meanings borne by each of the Website Articles as set out above which accuse the Claimant, amongst other things, of serious criminal activity as well as other wrongdoing which strikes at the heart of his reputation for honesty and integrity both professionally (in the way of his business activities) and personally.

   93.3   The nature and extent of the publication of each of the Website Articles, including the sensational and provocative manner in which they were presented.

   93.4   Paragraph 13 above is repeated. The purported NFFC fan-led, grassroots character and status of the Fake NFFC Campaign means that the allegations about the Claimant in the words complained of are likely to have been believed by all, or at least a significant proportion of, readers of the Website Articles;

   93.5   The Claimant will also rely upon the "grapevine effect" in respect of each of the Website Articles.

   The YouTube Videos

94   In support of his case on serious harm in relation to the publication of each of the YouTube Videos, the Claimant will rely on the following facts and matters:

   94.1   The nature and extent of the Claimant's reputation in England and Wales, as

38

particularised above at paragraphs 1 and 2 above;

94.2    The highly defamatory meanings borne by each of the YouTube Videos as set out above which accuse the Claimant, amongst other things, of serious criminal activity as well as other wrongdoing which strikes at the heart of his reputation for honesty and integrity both professionally (in the way of his business activities) and personally.

94.3    The nature and extent of the publication of each of the YouTube Videos, including the sensational and provocative manner in which they were presented.

94.4    Paragraph 13 above is repeated. The purported NFFC fan-led, grassroots character and status of the Fake NFFC Campaign means that the allegations about the Claimant in the words complained of are likely to have been believed by all, or at least a significant proportion of, readers of the YouTube Videos;

94.5    The Claimant will also rely upon the "grapevine effect" in respect of each of the YouTube Videos.

<u>The X Posts</u>

95    In support of his case on serious harm in relation to the publication of each of the X Posts, the Claimant will rely on the following facts and matters:

95.1    the nature and extent of the Claimant's reputation in England and Wales, as particularised above at paragraphs 1 and 2 above.

95.2    The highly defamatory meanings borne by each of the X Posts as set out above which accuse the Claimant, amongst other things, of serious criminal activity as well as other wrongdoing which strikes at the heart of his reputation for honesty and integrity both professionally (in the way of his business activities) and personally.

95.3    The nature and extent of the publication of each of the X Posts, including the sensational and provocative manner in which they were presented.

95.4    Paragraph 13 above is repeated. The purported NFFC fan-led, grassroots character and status of the Fake NFFC Campaign means that the allegations about the Claimant in the words complained of are likely to have been believed by all, or at least a significant proportion of, readers of the X Posts.

<u>The Mobile Billboards</u>

96   In support of his case on serious harm in relation to the publication of each of the Mobile Billboards, the Claimant will rely on the following facts and matters:

96.1   The nature and extent of the Claimant's reputation in England and Wales, as particularised above at paragraphs 1 and 2 above;

96.2   The highly defamatory meanings borne by each of the Mobile Billboards as set out above which accuse the Claimant, amongst other things, of serious criminal activity as well as other wrongdoing which strikes at the heart of his reputation for honesty and integrity both professionally (in the way of his business activities) and personally.

96.3   The nature and extent of the publication of each of the Mobile Billboards, including the eye-catching, sensational and provocative manner in which they were presented.

96.4   Paragraph 13 above is repeated. The purported NFFC fan-led, grassroots character and status of the Fake NFFC Campaign means that the allegations about the Claimant in the words complained are likely to have been believed by all, or at least a significant proportion of, readers of the Mobile Billboards;

96.5   The Claimant will also rely upon the "grapevine effect" in respect of each of the Mobile Billboards.

**The Defendants' Liability for the Statements Complained Of**

97   The Defendants' single and joint liability for the Smear Campaign can be demonstrated by or is to be inferred from the following facts and matters:

97.1   Paragraph 14 above is repeated. The First Defendant hired and instructed Harris Media to devise and implement the Smear Campaign: she was thereby the originator (or one of the originators) of the Smear Campaign.

97.2   The First Defendant paid Harris Media to devise and implement the Smear Campaign. This payment was made in two instalments. It was effected by the First Defendant directing and authorising the Second Defendant to pay the two instalments, which instalments the Second Defendant did in fact pay on the First Defendant's behalf.

97.3   The First Defendant:

97.3.1  sent Harris Media the necessary information and materials regarding

40

the Claimant on 3 and 16 November and 6 and 15 December 2023;

97.3.2 sent Harris Media a draft article about the Claimant for a newspaper on 3 November 2023;

97.3.3 sent Harris Media, on 15 December 2023, a list of names of approximately 80 journalists, along with their employing media organisations and, in some cases, their job titles;

97.3.4 sent Harris Media, on 18 December 2023, a list of names of sports journalists and their X handles;

97.3.5 corresponded with Harris Media in December 2023 about organising a mobile billboard to be driven by an advertising van around a stadium before, during and after a "*home*" football match in Nottingham, including on 23 December 2023 (being the day on which the First Billboard was ultimately published);

97.3.6 corresponded with Harris Media in December 2023 about organising an airplane banner to be flown on 23 December 2023;

97.3.7 requested, on 8 December 2023, that Harris Media "*do something*" in response to posts on X about the Claimant, and undertook to "*send later some Tweets about him*";

97.3.8 corresponded with Harris Media on 8 December 2023 regarding the content of a graphic on the X Account, and offered to provide further information in this regard, for use in the Smear Campaign;

97.3.9 sent Harris Media, on 20 December 2023, a list of 16 X accounts to "*tag*";

97.3.10 in an email with the subject "*Update for January*" to Harris Media on 9 January 2024:

97.3.10.1 instructed Harris Media to add new content on X, to remove certain content on X, and to tag an identified individual;

97.3.10.2 queried the outcome of "*the plane and the bus stations*";

97.3.10.3    inquired whether there was any video content or new photos for X "*about the van*";

97.3.10.4    discussed the possibility of using Meta, the technology company that owns and operates various online platforms, including Facebook and Instagram;

97.3.10.5    referred to "*YouTube*" and the need "*to see what will be done this month*";

97.3.10.6    stated that "*we don't have something else to do in Nottingham after the game of 7/1*" (7 January 2024 being the day on which the Second Billboard was published);

97.3.10.7    stated that there was a need "*to update the content*" for the "*AI video*";

97.3.10.8    stated that she was sending further information and materials regarding the Claimant; and

97.3.10.9    asked Harris Media to arrange a call with her the next day or after that date.

97.4    In the premises, the Claimant will contend that:

97.4.1    the communications particularised in paragraph 97.3 above clearly related to actual or proposed features of the Smear Campaign;

97.4.2    these communications reflect a high, consistent and active level of involvement by the First Defendant in the content and execution of those actual or proposed features; and

97.4.3    it is to be inferred that the First Defendant had a high, consistent and active level of involvement in all facets of the Smear Campaign's content and execution.

97.5    The Third Defendant:

97.5.1    had a pre-existing relationship with the First Defendant;

97.5.2    acting with and/or through the Fourth Defendant, referred the First

Defendant to Harris Media for the purposes of engaging and instructing Harris Media;

97.5.3 with and/or through the Fourth Defendant, earned a referral fee for having done so;

97.5.4 acted as a conduit for the payment of the second instalment by the Second Defendant to Harris Media for the devising and implementation of the Smear Campaign, by directing and/or authorising the Fourth Defendant to act as a conduit for that payment;

97.5.5 was copied into a significant amount of email correspondence between the First Defendant and Harris Media relating to the content and execution of the Smear Campaign over December 2023;

97.5.6 passed on instructions from the First Defendant to Harris Media;

97.5.7 generally referred new clients to Harris Media (on numerous occasions which the Claimant cannot presently identify pending full disclosure and/or the provision of further information);

97.5.8 had a pre-existing relationship with Mr Harris, on the basis of:

97.5.8.1 the Third Defendant's and Harris Media's involvement in the electoral campaign of Israeli Prime Minister Benjamin Netanyahu in 2015;

97.5.8.2 the Third Defendant's and Harris Media's involvement in a campaign run by an American organisation, "Shining City", in 2014-2015; and

97.5.8.3 the Third Defendant's and Harris Media's involvement in a US-based organisation, "One Jerusalem".

97.6 In the premises, the Claimant will contend that on the basis of the facts and matters particularised above, it is clear (or clearly to be inferred) that the Third Defendant:

97.6.1 had a comprehensive understanding of the services provided by Harris Media, and of the means by which it was prepared to deliver those

services;

    97.6.2  referred the First Defendant to Harris Media in the knowledge that she intended to instruct Harris Media to devise and implement a smear campaign against the Claimant;

    97.6.3  knew about the different features of the Smear Campaign, being the Website, the Website Articles, the YouTube Videos, the X Posts and the Mobile Billboards, and about the false and defamatory allegations about the Claimant which were published through those channels; and

    97.6.4  was therefore knowingly and actively involved in the process of publishing the statements complained of by the Claimant.

  97.7   In the premises, the Claimant will contend on the basis of the facts and matters particularised above, that it is clear (or clearly to be inferred) that the Fourth Defendant was knowingly and actively involved in the process of publishing the statements complained of by the Claimant.

**Damage**

98  By reason of the publication of each of (a) the Website Articles, (b) the YouTube Videos, (c) the X Posts, and (d) the Mobile Billboards, the Claimant has been gravely injured in his personal and professional reputations and has suffered considerable distress and embarrassment.

99  In support of his claim for damages, including aggravated damages, the Claimant will rely on the following facts and matters:

  99.1   The facts and matters set out in relation to both substantial publication and serious harm at paragraphs 87 to 96 above, including the highly defamatory nature of the accusations which the Defendants deliberately sought to smear the Claimant with as part of the Campaign.

  99.2   Paragraph 13 above is also repeated. The deliberately deceptive nature of the Smear Campaign, its false presentation as a grassroots campaign relating to a football club in which the Claimant has maintained at all material times immense pride, and the resultant credibility and authority which the Smear Campaign will

44

have enjoyed in the eyes of publishees of the statements complained of, has caused him enormous anxiety and distress, as well as damage, as was no doubt the Defendants' intention.

100 As a result of the matters set out above, the Claimant has also suffered actual financial loss. The best particulars which the Claimant can presently give of this, and the sum he is therefore seeking by way of special damages, are identified in Annexe attached to these Particulars of Claim. The Claimant reserves the right to seek additional losses as and when they are identified during the course of these proceedings.

**Injunction**

101 Unless restrained by the Court, the Defendants will continue to publish or cause to be published the same or similar defamatory words of the Claimant. In support of his claim for an injunction, the Claimant will rely on the following facts and matters:

101.1   The Smear Campaign only came to an end because the Claimant himself took steps to halt its being conducted and to secure the removal of the false and defamatory allegations made online as part of it, as opposed to any act or admission on the part of the Defendants or any of them.

101.2   The deliberately deceptive nature of the Smear Campaign and the Defendants' efforts to conceal their responsibility for the false and defamatory allegations published about the Claimant as part of it;

107.1   In respect of the Third and Fourth Defendants, their outright rejection in pre-action correspondence of the Claimant's claims against them.

**The Claim for Conspiracy to Injure by Unlawful Means**

102    The First, Second, Third and Fourth Defendants (or any two or more together) wrongfully and with intent to injure the Claimant and by unlawful means conspired and combined together to publish or cause to be published the false and defamatory allegations set out above. Paragraphs 5 to 15 and 97 above are repeated.

103    Pursuant to and in furtherance of this conspiracy, the First, Second, Third and Fourth Defendants published or caused to be published the said false and defamatory allegations, which had the foreseeable result of injuring or causing harm to the Claimant.

104    As a result of the matters set out above, the Claimant has been caused (and will

continue to be caused) loss and damage, in the sum of at least £2,100,000, as identified in Schedule 1 to these Particulars of Claim. The Claimant reserves the right to seek additional losses as and when they are identified during the course of these proceedings.

105 By reason of the aforesaid conspiracy and by reason of the unlawful means identified above (namely the acts of publication complained of above), the First, Second, Third and Fourth Defendants are jointly and severally liable to the Claimant in damages for conspiracy.

106 Further, the Claimant claims and is entitled to interest on all sums due to him at such rate and for such period as the Court shall deem just pursuant to s.35A, Senior Courts Act 1981.

107 Unless restrained by the Court, the Defendants will continue to pursue, or perform acts in relation to, the said unlawful means conspiracy. In support of his claim for an injunction, the Claimant will rely on the facts and matters set out under paragraph 101 above.


**AND THE CLAIMANT CLAIMS AGAINST THE DEFENDANTS AND EACH OF THEM:**

(1) Damages, including aggravated damages, for libel.

(2) Damages, including aggravated damages, for unlawful means conspiracy.

(3) Interest pursuant to s.35A, Senior Courts Act 1981, to be assessed, pursuant to paragraph 106 above.

(4) An injunction to restrain each of the Defendants whether by themselves, their servants, their agents, or otherwise howsoever from publishing or causing or permitting to be published the words complained of or any words to the same or similar defamatory effect in respect of the Claimant, and/or from pursuing, or performing acts in relation to, the said unlawful means conspiracy.

(5) Further or other relief.

(6) Costs.

**DAVID SHERBORNE**

**LUKE BROWNE**

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Claimant to sign this statement on his behalf.

Signed:                    ….....……………………………………..

Full name:                 CHRISTOPHER HOWARD SCOTT

Name of Claimant's Legal    Slateford
Representative's Firm:

Position or office held:    Senior Partner

Dated:                     **26 April** 2024

Filed this **26** day of **April** 2024 by Slateford, 11-13 Charlotte Street, London, W1T 1RH, solicitors for the Claimant.